# UNITED STATES DISTRICT COURT

for the
District of Columbia

| | | |
|---|---|---|
| David Alan Carmichael | ) | |
| *et al.* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:19-CV-2316-RC |
| | ) | |
| Michael Richard Pompeo | ) | |
| *In his Official Capacity as Secretary of State* | ) | |
| *et al.* | ) | |
| | ) | |
| *Defendants* | ) | |

### Plaintiffs' Combined Reply to Defendants' Opposition
### To Plaintiffs' Motion For Partial Summary Judgment

**I.    Introduction:**

1.    In the first ten pages of "DEFENDANTS' REPLY IN FURTHER SUPPORT OF
THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT" (Def. Resp.), the Defendants' "REPLY" to our response to their motion to dismiss
or in the alternative Summary judgment blends with their "RESPONSE" to our cross-motion for
summary judgment.  Wherefore, we reply to the elements where the Defendants' response
document reaches our cross-motion notwithstanding the overlap.

2.    The Defendants' insistent allegation that a number of the Social Security
Administration's (SSA's) may be "theirs"; and that a voluntary number, for which they can show
no proof that we have volunteered, might cause the matter to have to be adjudicated.  It might
require us to amend the complaint to address the questions of law that the Defendants argument
invokes, or to fix such erroneous or fraudulent records.  Their staunch position that 22 U.S.C.
§2714a(f) and the Secretary's prerogative preempts 22 U.S.C. §2721, the Free Exercise clause of

the First Amendment, and E.O. 13798, might also require amending the complaint and impaneling three judges.

3.      It is important for the court to observe that we provided in our complaints, petitions, and motions, statements of fact that were verified by our sworn oaths before a notary or under the penalty of perjury under the laws of the United States of America.  We provided a verified Statement of Undisputed and Uncontroverted Facts.  The Defendant has not provided such a list or statement, nor particularly refuted the facts that are material to this motion, though they have had ample opportunity.

## II.     Defendants' Case-Citings Support The Plaintiffs' Case

4.      In the Defendants' claim that "Plaintiffs have failed to demonstrate that Defendants' actions imposed a substantial burden on their religious exercise", the Defendants' on page 2 cite two cases touching on the First Amendment without showing any text from the cases that relate to this case.  The cases that they cite **are inapposite** (Def. Resp., para I., p. 2.).  Nonetheless, those cases reveal that the law supports our position rather than the Defendants.

5.      In *Archdioces of Wash. V. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 113 (D.D.C. 2017) ("WMATA"), WMATA had made a policy to exclude topics of religion on bus advertising.  **In our case**, Congress has mandated the permissibility of those things protected by the First Amendment.  Religion is protected by the first amendment.  Congress has mandated its protection, and a passport may not be denied because of the Secretary's or his subordinate's demand for an applicant to abandon the free exercise of religion in order to obtain a passport.

6.      *Priests For Life v. HHS*, 772 F.3d 229, 246 (D.C. Cir. 2014) is **also inapposite** to this case.  There, the government provided for an "**opt out**" mechanism where the religious objector must merely provide notice of their objection based upon religion in order to "**opt out**" of the

government's requirement.  **In our case**, we repeatedly gave notice of our objection based upon religion (ECF 15, Complaint Amended, paras. 16,17,18,19, *passim*, and pp. 31-33, paras. a.-w.; ECF 5-6, Pakosz & Lewis Petitions for Joinder; Plaintiffs' Statement of Undisputed and Uncontroverted Facts PSUUF, paras. 2.a,c,d,e,f,h,I,j,l,n,p,r,t,n,w).  Though the government has an '**opt-out**' provision by way of the 22 USC §2721, Impermissible basis for the denial of a passport, and the humanitarian reasons good cause provision of 22 U.S.C. 2714a(f)(1)(B), the Defendants turned-the-screws rather than permit us to **opt-out**.  In *Priests For Life v. HHS*, the government was imposed upon by the First Amendment to provide relief to the religious objector.  The context of that case, distinguished from ours, is that the First Amendment objection and protection to the employer did not adhere to particular employees who might not have the same religious observance.  The context of these two cases in no way supports the Defendants "Plaintiffs' RFRA claim must fail" into which the Defendant seems to funnel our cross-motion on the First Cause of Action as well as the entire case.

### III.   The Defendants' Worldview Conflicts With Law As Well As Plaintiffs' Religion, As Confirmed By The 9th Circuit In A SSN Religious Objection Case

7.     What emerges from the Defendants' Response is a clash of worldview, and a clash in understanding of the purpose of government and the limits of government means to reach just ends.  The Defendants elevate their non-OMB-authorized form above the Constitution's First Amendment and above the statutes at 22 U.SC. 2721 and 2714a(f)(1)(B) , saying, "they could have simply provided a declaration to the State Department confirming (Plaintiffs did not have a social security number)." (Def. Response, p.3, last para.)

8.     We, as a matter of religion, cannot confess an oath regarding what we have no way of having first-hand knowledge of being true or false, or can we confess an oath of what we believe to be fundamentally false.  Affidavits are for the purpose of men confessing what they know to

be true by first hand knowledge.  A "Claim" is what the Defendants' are demanding that we make through their particular 'affidavit' to declare what is true about somebody else's records. The "affidavit" that we are able to, and did, make in truth, by first hand knowledge, is that religion prohibits us from identifying with a SSN as an element of our identity and that we are not, are accused not, nor proven to be, certified tax debtors, infidels, or pedophiles.  The "Claim" to which we are willing to sign an affidavit is that any record of the SSA claiming to be associated with us has been established by fraud, among other wrongs.  That "claim" may or may not be necessary depending on whether the laws we cite in our cross-motion protect us from injury intended by the Defendants' regarding their assumed existence of a SSA record.  If the Defendants say that we can be excluded from a passport due to fraud or error, they must then also admit that we can be excluded from association of a SSA record number due to fraud, error, etc.

9.     The Defendants then go on to imply that the burden upon our religious exercise - <u>our eternal damnation or loss of eternal reward</u> (ECF 27, Att-1, pp. 9-11 & Addenda 1-3) - is a mere inconvenience.  They imply that the inconvenience upon us is highly permissible for the convenience of government administrative efficiency preferences codified merely since 2016. (Def. Resp., last para. P.3)  The Defendants cite *Graham v. Comm'r of Internal Revenue Serv.*, 822 F.2d 844, 851 (9th Cir. 1987) as authority for the "mere inconvenience" quote, though it is a case of Scientology-training-fee tax deductibility that is wholly off point here.  However, *Graham v. Comm'r IRS* <u>cited an on-point SSN case</u> that was decided under strict scrutiny for the Plaintiff where the Defendant California Director of Benefit Payments denied public assistance benefits to Callahan's unnumbered daughter.  *Callahan v. Woods*, U.S. Ct. App., 736 F.2d 1269, (9th Cir., 1984)  The opinion and remand order, by the U.S. Ct. App. Ninth Circuit, is instructive

in that <u>the 9th Circuit Court decided squarely against the position taken by the Defendants' in our case</u> (Addendum 4).

10.     The *Callahan v. Woods* case was first considered by the 9th Circuit, Ct. App., in a decision of theirs in 1981 as to whether the Plaintiff's objection to identifying his daughter with an SSN was an objection based upon religion, and whether that the government requiring him to obtain a number for his daughter would place a substantial burden on his religion.  The 9th Circuit ruled in favor of the Plaintiff (Addendum 5).  The Court said:

> "A religious claim, to merit protection under the free exercise clause of the First
> Amendment, must satisfy two basic criteria. **First**, <u>the claimant's proffered belief must be
> sincerely held</u>; the First Amendment does not extend to "so-called religions which . . . are
> obviously shams and absurdities and whose members are patently devoid of religious
> sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir. 1974), cert. denied, 419 U.S.
> 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); see ***Stevens v. Berger***, **428 F. Supp. 896,
> 899 (E.D.N.Y. 1977)**. **Second**, as the Supreme Court held in *Wisconsin v. Yoder*, 406
> U.S. 205, 215-16, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972), <u>the claim must be
> rooted in religious belief, not in "purely secular" philosophical concerns</u>. Cf. United
> *States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (test for
> religious belief within meaning of draft law exemptions is whether beliefs professed are
> sincerely held and, in claimant's scheme of things, religious) *Callahan v. Woods*, U.S. Ct.
> App., 658 F.2d 679, 683 (9th Cir., 1981)   (Emphasis added; ***Stevens v. Berger*** is an on-
> point **SSN religious objection case** whether the Plaintiff prevailed)

11.     The two prongs cited by the 9th Circuit to determine if the person's free exercise of religion was protected by the First Amendment are; Firstly, the proffered belief must be sincerely held; and secondly, that that claim must be rooted in religious belief, not in "purely secular" philosophical concerns.  In our case, those two prongs have clearly been satisfied by the facts of religious exercise (belief and practice) that we proffered and verified under oath.  (ECF 1, 5, 6 & Addenda 1-3)  The subjective measuring stick "substantial burden" is not the trigger for the protection of the First Amendment.  The objective two prongs that we meet invoke the protection of the First Amendment.  Therefore, by that objective standard, we secure the protection of 22 U.S.C. §2721 (Impermissible basis for the denial of passports).  There is no discretion left to the

Secretary or his subordinates to consider their interest in efficiency.

## IV.    The Law 22 U.S.C. §2721 Protects Plaintiffs; Equity Is Only Necessary Without It

12.    The 9th Circuit in their 1981 reversal and remand of *Callahan's* case, to the District

Court, 658 F.2d 679 (1981), directed the lower court to make "a determination, in light of

*Thomas*, of the extent to which Callahan's protected belief is burdened by the government's

requirement, and whether the government here is following the "least restrictive means of

achieving some compelling interest." Citing *Thomas v. Review Board of the Indiana Employment*

*Security Division*, 450 U.S. 707, 715, 101 S. Ct. at 1431 (1981).  The Callahans did not have the

benefit of a statute like 22 U.S.C. §2721 that particularly outlawed the denial of their relief

benefits over something protected by the First Amendment.  They were subjected to the

'subjective' test of "extent to which Callahan's protected belief is burdened by the government's

requirement" (substantial burden) *Callahan*, 736 F.2d 1269, (9th Cir., 1984) .   The test was

necessary to determine whether there was an injury that would make standing for an action at

law, or equity.  Regarding our First Cause of Action, that 'extent of burden' test is not necessary.

The test is fulfilled by the 'objective' legislative mandate in 22 U.S.C. §2721, prohibiting the

denial of passports for any speech, activity, belief, affiliation, or membership, within or outside

the United States, which, if held or conducted within the United States, would be protected by

the first amendment to the Constitution of the United States.  The equitable test is not necessary

unless the law 22 U.S.C. §2721 is not adequate.

13.    Thus, our belief and practice (exercise) of religion qualifies for protection of the First

Amendment because it is sincerely held and rooted in religious belief.  The question is:  does 22

U.S.C. §2721, with its broad language that includes activity and belief, protect religious activity

and religious belief?  If so, the Defendant violated the laws of the United States when they

denied and revoked our passports.

**V.     Equity Weighs In Favor of The Plaintiffs According To *Callahan & Stevens & Bowen*;**

14.     If the "substantial burden" test is necessary in our case, the determination by the 9th

Circuit in *Callahan,* (9th Cir., 1981 & 1984) leaning heavily on *Stevens v. Berger*, 428 F. Supp.

896 (E.D.N.Y. 1977) is that the government hinging welfare-relief benefits on the applicant's

association with a SSN contrary to religion places a substantial burden on religion.

> "Given the close similarity of the ideas involved in this case and those
> in *Stevens v. Berger, supra,* Judge Weinstein's thorough and compelling
> analysis of the Stevenses' dogma is fully apposite here. In *Stevens* the plaintiffs,
> while seeking AFDC benefits for their children, objected to the issuance of
> social security numbers as a prerequisite to eligibility. They explained that
> social security numbers were becoming the universal identification number
> predicted in the *Book of Revelation* as the tool used by the Antichrist to control
> individuals. The Stevenses feared that obtaining numbers for their children
> would jeopardize their children's spiritual well-being and threaten their
> opportunity to enter heaven. 428 F. Supp. at 901-02. Noting that neither
> widespread adherence nor scriptural support is a prerequisite to constitutionally
> protected status for a purportedly religious claim, the court nevertheless traced
> the history of the Jewish and Christian concepts of the Antichrist and found that
> "The meaning of the mark to theologians — whatever they believe the mark to
> have been — is strikingly similar to the meaning for the Stevenses, who see a
> potential for abuse of the spiritual side of humanity in a number which could act
> as a universal identifier." 428 F. Supp. at 905."  *Callahan v. Woods*, U.S. Ct.
> App., 658 F.2d 685-686 (9th Cir., 1981)

15.     On remand, the district court concluded that the government regulation (Federal

imposed upon the State welfare program) at issue (demanding an SSN from the welfare benefit

applicant) imposed a **substantial** burden on the Plaintiff Callahan's religion.

> "Upon a close scrutiny of Thomas and the cases examined infra, the Court
> concludes the government regulation here at issue imposes a substantial, albeit
> indirect, burden upon plaintiff's religious beliefs, and that the proper standard of
> review is, therefore, the compelling interest test."  *Callahan v. Woods*, 559 F.
> Supp. 163, 167 (1982)

16.     The *Callahan* case returned to the 9th Circuit after "the district court, 559 F. Supp. 163,

determined that the burden on Callahan, although substantial, was heavily outweighed by the

government's compelling interest in having aid recipients classified by SSNs, and that the requirement is the least restrictive means of administering efficiently an enormous social welfare program." *Callahan v, Woods*, 736 F.2d 1269, 1272 (9th Cir. 1984).   The 9th Circuit on the second appeal had to determine, "Was the district court correct in ruling as a matter of law that a regulation requiring the assignment of a number to every social security recipient is the least restrictive means of furthering a compelling state interest?"   *Ibid*   The 9th Circuit themselves did weigh in on the matter of substantial burden and said, "We conclude that the SSN requirement substantially interferes with the free exercise of Callahan's religious beliefs.  Accordingly, the state interest test applies."   (Emphasis added)

### A.   Imposing SSN Identification On The Passport Applicant, Under The Color of Efficiency, Is Not The Underlying Value Which Is Undeniably Important Or of The Highest Importance

17.    The 9th Circuit in *Callahan* made an important observation, referencing Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development*, 800 Harv.L.Rev. 1381, 1390 (1967).  "In determining whether the government has a compelling interest in a particular regulation, it is useful to look first at the importance of the value underlying the regulation, and second, at the degree of proximity and necessity that the chosen regulation bears to the underlying value." *Callahan v, Woods*, 736 F.2d 1269, 1274 (9th Cir. 1984) (Emphasis added) **In our case**, the underlying value relates to the purpose of government, and the purpose of the passport relating to the purpose of government.  The purpose of government as it relates to the passport must be to the end of protecting life, liberty, and property rights of Americans.  The passport program is legitimate when it is a means to those ends.  It is to those who violate the life, liberty and property of Americans that the passport ought to be denied.  That is one **underlying value**.  The mandate of the First Amendment and 22 U.S.C. 2721 is also for the

protection of life, liberty, and property rights of Americans.  That is the other **underlying value.**
It is like the 9th Circuit's determination in *Callahan* that "The value of the AFDC program, a
nationwide social welfare system, is underlying important. *Cf. United States v. Lee*, 455 U.S.
252, 258, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security system)..., promotes a
government interest of the highest importance." *Callahan*, 726 F.2d 1269 at 1274 (1984).
(Emphasis added)   In comparison, the benefits derived from the institution of the number of the
beast, under the guise of streamlining bureaucratic efficiency, is not the **underlying value** for
which the government has been instituted.  Issuing passports to those who ought to have them,
and protecting a man in his religion, are underliably important government interests of the
highest importance.  They need no opinion-paper declaration to elevate them to a place of
relative and subjective significance of administrative convenience or efficiency.   The use of an
SSN, as one tool of many to search data bases, is merely one means to a legitimate but secondary
end.

### B.   Government Has A Duty In Equity To Make An Exception For Religious Objector

18.  The 9th Circuit in Callahan yielded to the government's argument that the use of the
welfare-benefit-program-record number SSN particular to that program was a compelling
governmental interest because it was stated by declaration, but not proven, that an alternative
system would cost 900 million dollars.  Yet, the Circuit court said that there was no evidence that
the exemption of one person from the number requirement would mandate the development of an
entire non-numerical system.  The Court remanded the case back to the district court to see if the
government had a reasonable opportunity to establish the cost of exempting Callahan, saying, "If
it finds that the government passed up this opportunity, we direct the court to enter judgment for
Callahan."  By the following silence, we presume the matter was settled for *Callahan*.

"Commentators have observed that, because of its broad and indefinite nature, this test is often inadvertently reduced to an inquiry which stops after the discovery of a compelling state interest. See, e.g., Tribe, American Constitutional Law 855 (1978). The purpose of almost any law, however, can be traced to a fundamental concern of government. Balancing an individual's religious interest against such a concern will inevitably make the former look unimportant. It is therefore the "least restrictive means" inquiry which is the critical aspect of the free exercise analysis. This prong forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction. *See* Clark, *Guidelines for the Free Exercise Clause*, 83 Harv.L.Rev. 327, 331 (1969). If the compelling state goal can be accomplished despite the exemption of a particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest. A synthesis of the two prongs is therefore the question whether the government has a compelling interest in not exempting a religious individual from a particular regulation. See, e.g., *Sherwood v. Brown*, 619 F.2d 47, 48 (9th Cir. 1980) (compelling state interest in not exemption Sikh from Navy helmet requirement because absence of single helmet would endanger entire crew). Such a formulation prevents the government from relying on its generally great interest in maintaining the underlying rule or program for unexceptional cases." *Callahan v. Woods*, 736 F.2d 1269, 1272 (1984)

19.     **In our case**, the government admits that they issue passports to those who have never been associated with the damnable SSN. Thus, having no streamlining-efficiency number does not foil whatever ends they have of using an SSN as a means. The least restrictive means to accomplish their ends, is to do the same thing that they did prior to the 2016 institution of their 'permissible' power 22 U.S.C. §2714a(f), unless of course their true ends is to use the passport program as one means of coercion into our worshipping the beast or suffering for not doing so.

### C.   Defendant Emphasized-Quotation of Supreme Court Case Bowen v. Roy Shows Plaintiffs' Situation Warrants Law And Equity Protection For Exercise of Religion

20.     The Defendants' citing of the U.S. Supreme Court decision in *Bowen v. Roy* reveals important distinctions between the statements by Chief Justice Burger as he saw the importance of the burden upon the religion of Mr. Roy who did not adhere to the mandates of the Bible, and the importance of the burden on religion with us (Def. Response p. 4). The government's

demand might not have for Mr. Roy created "…**any danger of censorship or place a direct condition or burden on the dissemination of religious views**."  Citing *Bowen v. Roy*, 476 U.S. 693, 703 (1986)   For us it does "affirmatively compel (us), by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that they find objectionable for religious reasons."  We are sanctioned like a certified tax evader, infidel and pedophile.  In the view of Chief Justice Berger, he did not consider welfare support to be undeniably important or of the highest importance.  We do not know if he would consider the right of travel to be undeniably important or of the highest importance.  We do not know if he thought our compliance with the United States laws demanding that we register for a passport in order to leave the United States as undeniably important or of the highest importance.

21.    The other portion of the citing of *Bowen v. Roy* that the <u>Defendants emphasized in bold</u> is, "**Rather it is appellees who seek benefits from the Government and who assert that, because of certain religious beliefs, they should be excused from compliance with a condition that is binding on all other persons who seek the same benefits from the Government.**"  *Ibid*    In our case, the government does not make the SSN identification "binding on all other persons who seek the same benefits from the Government."  This statement of Chief Justice Burger goes to the point that he made later in his opinion, ""The "good cause" standard created a mechanism for individualized exemptions. If a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent."  *Ibid* at 708.  Again, Mr. Roy did not have available to his case the benefit of a positive law like 22 U.S.C. §2721 that provides express protection of First Amendment rights with regard to passports.  The rejection of Chief Justice Burger's diminution of religion in *Bowen v. Roy* was expressed concretely by the Legislature and Executive in the Religious

Freedom Restoration Act, 42 U.S.C. §2000bb, et. seq.

**VI.    Plaintiffs' Verified Specified Material Facts, Uncontested By The Defendants' Response, Must Be Applied To Support Plaintiffs' Cross-Motion For Partial Summary Judgment**

22.    We submitted a list of those facts that we declared to be true in our complaint, petitions, responses, and motions verified by affidavit before a notary public, or sworn to under the penalty of perjury under the laws of the United States of America (ECF 1, 5, 6, 15).  The Defendants have not particularly challenged that Plaintiffs' statement of facts by providing the Defendants' own list of material facts upon which we agree or disagree.  Unless expressly stated within the Defendants' response, our verified statements of fact must be considered as uncontroverted for the purpose of our cross-motion for Partial Summary Judgment.

23.    The Defendants response is interspersed with allegations of our failures to "demonstrate" proof against their allegation of "compelling governmental interest" but "demonstrate" is not a burden that we bear since the Defendants' mere proffering of the Declarations of Rolbin and Fultz were particularly refuted by our statement of Disputed Facts (ECF 27 Att-2).  We have not the opportunity to depose or cross-examine Rolbin and Fultz.  We submitted our first demand for production of documents on December 31, 2019, which the Defendants received on January 6, 2020 but to which they have not responded.  On March 12, 2020, along with our discovery queries of our interrogatories to Jonathan M. Rolbin and Florence Fultz, we submitted a reminder to the Defendants' attorney that we looked forward to their first production of documents that we sent December 31st.  The Defendants received those interrogatory demands on March 16, 2020 but have not responded.  The weight of the Defendants 'Declarations' cannot be substantial without the due process of open court testimony, deposition, and record review scrutiny.

**VII.   The Defendants Are Adamant That Plaintiffs' Exercise of Religion Had No Influence On Their Decision, And In Doing So Support The Plaintiffs' Clause of Action**

24.    The Defendants state on page 8 of their Response ""Plaintiffs claim that their "motive" in not disclosing their social security numbers is "due to religion," *id.* at 2-4, but they provide no admissible evidence whatsoever that this motivation made any difference in the State Department's adherence to its requirement that passport applicants provide a social security number, if they have one, to obtain a passport." (Def. Response, p. 8)  The Defendants there miss the point of the complaint.  Indeed, notwithstanding that we squarely placed a request for religious accommodation before the Defendants, it did not "(make) any difference" in the State Departments conduct where they denied our passport despite 22 U.S.C. §2721.  It should have made all the difference and the Defendants should have obeyed the mandatory language of 22 U.S.C. §2721 unless our objection was not sincere or religious.

**VIII. The Defendants Misread The Cross-Motion In The Particulars of The Plaintiffs Dispute of The Declarations of Rolbin And Fultz**

25.    The Plaintiffs do dispute the Defendants' statement that they cannot "verify an applicant's identify (sic) and ensure against potential fraud." (Def. Response, p. 7); or "cannot efficiently, effectively, and/or completely and accurately adjudicate an applicant's identity, detect and prevent fraud, and protect the integrity of the passport issuance system without applicants (SSN)."; or "are the least restrictive means by which the Department can verify an applicant's identity. (Def. Response, p. 1)

### IX.     The Defendants Error Saying That The *Zzyym* Case Is Not Relevant

26.    The Defendants state, "Plaintiff's reliance on *Zzyym, v. Pompeo*, 341 F. Wupp. 3d 1248 (D. Colo. 2018), which involved a challenge under the Administrative Procedure Act ("APA") to the State Department's gender policy for passport applications, is misplaced." (Def. Response, p.

10) There they say that we do not purport to bring an APA challenge in this lawsuit. Paragraphs 9. and 142. of the Complaint, and page 58 of our cross-motion memorandum (ECF-27 Att-1), demonstrate that the Administrative Procedures Act is invoked for this case. Nonetheless, the practice of the Defendants against Zzyym, and the Defendant's zeal for their desire for the person to conform to the form's norm, wrongly injured the Plaintiff who could not answer the form demand in the way the Defendant demanded. The situation and facts in that case are similar to ours.

27.    The remainder of the Defendants' Response after page ten is clearly relating to their "reply" to our "response" to their motions (cite in the record), rather than reaching to the matter of our cross-motion (Def. Response, pp. 10-16) Therefore, we will not address those things it this our "reply" to their "response" to our cross-motion.

**X.    Defendants Mischaracterize Plaintiffs' Cross-Motion, Obscuring The Claim That Challenges The Secretary's Authority To Deny A Passport According To The Law As Applied To Material Facts**

28.    The Defendants say on page 10 of their Response, "Plaintiffs do not dispute that the Secretary has the authority to deny a passport application based on a failure of an applicant to provide a social security number." (Def. Response, p. 10) Such a "failure" citation is due to the casualty of our using the words of Mr. Rolbin in our Plaintiffs Statement of Undisputed and Uncontroverted Facts (ECF 27 Att 2) where we were showing that the Defendants asserted that is was for the lack of identifying with a SSN that we were denied passports. We **do** dispute particularly the "failure" characterization of the Defendants' statement ""that the Secretary has the authority to deny a passport application based on a "failure" of an applicant to provide a social security number."" The Defendants are wrong in fact and law. The statute permitting the Secretary from "Revocation or denial of passport in case of certain unpaid taxes" nowhere

mentions the word "failure" and nowhere is "failure" defined.  It is an innovation of Defendants where they make up their own terms and definitions as a 'super' legislature, while ignoring the intention of the permissive statute and the express terms of the mandatory statute.  Read 22 U.S.C. 2714a(f)(A), connecting the hierarchal dots of the **bold** letters, and observe our later commentary regarding those **bold** words and those words that are <u>underlined</u>:

"**§2714a**. Revocation or denial of passport **in case of certain unpaid taxes**
    (a) to (d) Omitted
    (e) **Authority to deny or revoke passport**
        (1) **Denial**
            (A) **In general**
                **Except as provided under subparagraph (B)**, upon receiving a certification described in section 7345 of title 26 from the Secretary of the Treasury, the Secretary of State shall not issue a passport to any individual who has a seriously delinquent tax debt described in such section.
            **(B)** Emergency and **humanitarian situations**
                <u>Notwithstanding</u> subparagraph **(A)**, the **Secretary of State may issue a passport**, in emergency circumstances or **for humanitarian reasons**, to an individual described in such subparagraph.
        (2) Revocation
            (A) In general
                The Secretary of State may revoke a passport previously issued to any individual described in paragraph (1)(A).
            (B) Limitation for return to United States
                If the Secretary of State decides to revoke a passport under subparagraph (A), the Secretary of State, before revocation, may-
                (i) limit a previously issued passport only for return travel to the United States; or
                (ii) issue a limited passport that only permits return travel to the United States.
        (3) Hold harmless
            The Secretary of the Treasury, the Secretary of State, and any of their designees shall not be liable to an individual for any action with respect to a certification by the Commissioner of Internal Revenue under section 7345 of title 26.
    (f) **Revocation or denial of passport in case of individual without social security account number**
        (1) **Denial**
            (A) **In general**
                **Except as provided under subparagraph (B),** upon receiving an application for a passport from an individual that either-
                (i) does not include the social security account number issued to that individual, or
                (ii) includes an incorrect or invalid social security number willfully,

intentionally, negligently, or recklessly provided by such individual, the Secretary of State is authorized to deny such application and is authorized to not issue a passport to the individual.

**(B)** Emergency and **humanitarian situations**

<u>Notwithstanding</u> **subparagraph (A),** the Secretary of State may issue a passport, in emergency circumstances or **for humanitarian reasons**, **to an individual described in subparagraph (A)**."

29.    Which is preemptive in 22 U.S.C. §2714a - subparagraphs "(B)" or subparagraphs "(A)"?  "Except as provided under subparagraph (B)" indicates that items "(i)" "or (ii) of subparagraph "(A)" are preempted by the "humanitarian reasons" of subparagraph "(B)".  Which is preemptive where an applicant's request for first amendment protection is requested - 22 U.S.C. §2721 or 22 U.S.C. §2714a?  We contend, that there are <u>no</u> facts in existence at all that warrant the denial of passports to us because, as a matter of religion, we do not identify with a SSN.  Secondly, there is no "failure" on our parts.  Every thing we have done has been a success.  We successfully communicated our obligations to not worship the beast through the confession of the number of the beast as an element of our identity.  Therefore **with regard to us** and the facts related to our applications for passports, <u>we</u> **do** <u>dispute</u> "that the Secretary has the authority to deny a passport application based on a "failure" of an applicant to provide a social security number.

**XI.    Plaintiffs' Complaint Might Require Amendment To The Complaint To Include A Cause of Action To Declare 22 U.S.C. §2714a(f) Unconstitutional For Overbreadth and As Void For Vagueness**

30.    The directory statements of 22 U.S.C. §2714a, subparagraphs (f)(1)(A)(i) and (ii) appear be particularly limited to the matter of someone who has gone through due process to prove that they have serious tax debt, according to the title and the only other non-repealed subparagraph (e).  The title is, "Revocation or denial of passport in case of certain unpaid taxes."  We are able to validate by affidavit that those certain unpaid taxes, particularized in

subparagraph (e), do not apply to us since we would have first hand experience of such due process related to "…receiving a certification described in section 7345 of title 26 from the Secretary of the Treasury…." (22 U.S.C. §2714a(e)(1)(A) quoted verbatim in the preceding "reply" paragraph).  Yet, that purpose of government that does not apply to us is wrongly burdening our religion, and we can verify by our affidavit of our first-hand knowledge that we have not received notice of any serious tax debt in accordance with the "(d) Contemporaneous notice to individual" provision of the F.A.S.T. Act, 129 Stat. 1730 (26 U.S.C. §7345).

31.    Since the 22 U.S.C. 2714a, subparagraphs (f)(1)(A)(i) and (ii) are driving the Defendants to ignore the permissible 'directory' nature of the clause and its word "authorized"; and it is driving the Defendants to ignore the caviat "Except as provide by subparagraph (B)" provision for exception for humanitarian reasons; and it is driving the Defendants to ignore the First Amendment protections of 22 U.S.C. §2721, Impermissible basis for denying passports; and it is driving the Defendant to be incapable of discerning that the Secretary should limit the denial of passports to those who do not identify with a SSN because they are exercising a wrong, rather than exercising a right; the Defendants demonstrate that the statute is <u>void for vagueness</u>.

32.    Overbreadth and Void For Vagueness are strong possibilities.  As we understand it, the civil law has to be spelled out explicitly so that the reader can know what to do even if they do not know right from wrong.[1]  The Defendants don't seem to get it.  We can see how the dots connect, and we have faithfully articulated our perception.  We believe we are right.  But if those who are supposed to act on the statute are not able to connect the dots, and we are injured because of it, we have a cause of action for the statute's overbreadth and vagueness.

**XII.  Plaintiffs' Complaint Might Require Amendment of The Complaint To Include The Secretary of Health And Human Services As Defendant If SSN Records Need To Be Suppressed As The Secretary Does For Members Of The Amish Sect**

---

[1] "Evil men do not know justice; but those who seek YeHoVaH understand all."  Holy Bible, Proverbs 28:5

33.    The Defendants' entire defense seems to rest on their statements like, "their social security numbers."  (Def. Response, pp. 1, 3, 5, 6, 7, 8)  The Defendants did not dispute that participation in the Social Security program is voluntary according to the spokes-person for the Social Security Administration (ECF-15, p. 29, para 92.; ECF 27 Att-3, p. 34, para bb.).  They pointed out that we have a religious objection to such a thing, and that we have complained to the SSA about the fraud upon which any record produced intended to associate with us was based.  We pointed out that the SSA never refuted our notices of the fraud. We pointed out that the SSA suppresses the record for Amish people.  I, Plaintiff Carmichael, got a letter from the SSA explaining that Amish people are required by the IRS to apply for a SSN in order to get a tax exemption letter from the IRS.  The SSA explained that after getting their tax exemption letter from the IRS, the Amish send a letter to the SSA explaining that they acquired the SSN merely as a control number for their tax exemption letter application, and they request the SSA to suppress the record.  The SSA explained in writing to me, Plaintiff Carmichael, that the SSA then sends a letter to the Amish person to tell them that the record has been suppressed, and the SSA tells the Amish person that they "can honestly say that you don't have a Social Security Number."  If 22 U.S.C. §2721 does not provide a mandate to the Secretary to not deny our passports for our sincerely held religious exercise, according to the Defendants' arguments, then we need to amend the Complaint to add the Secretary of Health and Human Services to the list of Defendants and cite facts and injury to obtain relief by having us be treated as well as the Amish.

**XIII. The Court Needs To Consider Whether The Process of A Three-Judge Panel Is Required If 22 U.S.C. §2721 Is Not Adequate To Protect Plaintiffs From Denial of Their Passports**

34.  It is our opinion that the First Amendment protection of 22 U.S.C. §2721 ought to include our exercise of religion to not identify with a SSN.  Since it is expressly a mandate of

positive law, there is no need for a three-judge panel to make that determination.  A three judge

panel might be needed to authoritatively find and declare 22 U.S.C §2721 does not provide First

Amendment protection to our exercise of religion.

35.    If the Court needs to find and declare that 22 U.S.C. §2714a is unconstitutional as void

for vagueness or overbreadth, after appropriate complaint amendment, then a three-judge panel is

probably necessary.  Those judges might also need to be impaneled if deeper considerations of

the governments' powers and practices need to be scrutinized as matters of law and equity.

**XIV. Summary**

36.    The Court needs to declare those things demanded in paragraph 63., subparagraphs a.

through j. of our Cross-Motion Memorandum (ECF 27 Att 1).  Our Statement of Undisputed and

Uncontroverted Facts has verified facts that are material and sufficient to support summary

judgment to the end of the First Cause of Action, reserving other relief to the Plaintiffs.  The

Court ought to declare those facts as material and proven for the purpose of our motion for

Declaratory Judgment on the First Cause of Action.

37.    Foremost, the Court needs to determine and declare whether 22 U.S.C. §2721 reaches

our exercise of religion and the Defendants' demand that we associate or identify ourselves with

an SSN notwithstanding our religious prohibition.  Firstly, religion must be one of those things

protected by the First Amendment to which the statute refers.  If religion is one of those things

protected, then the two-prong measure of whether it protects us is to test if our exercise (belief

and practice) is sincere and if it is religious.  If so, then that law makes the denial and revocation

of our passports unlawful.  The Court must declare it so.

38.    If 22 U.S.C. §2721 is in anyway inadequate to the task of protecting us in obtaining

passports without associating with a SSN as an element of our identity, then the other causes of

action need to be processed.  Those causes of action are not ripe without first an opportunity for

us to research and produce a thorough treatise on the applicable law - after the due process.  That

process includes but is not limited to discovery; examination of the Defendants' witnesses and

our government witnesses; review of the record which has not been disclosed prior to the

Defendants' motion for Summary Judgment contrary to the rules of court; amendment to the

Complaint to include the addition of the Secretary who can suppress SSA records or to determine

whether 22 U.S.C. §2714a(f) is unconstitutional, void for vagueness or overbreadth; and etc.

39.    Another determination to make is whether the Complaint–Amended must be amended

to include the citing of 22 U.S.C. §211 as it relates to the matter of the power of the Executive

Order 13798 to influence the conduct of the Secretary of State regarding the duty to obey the

orders or policies promulgated by the President of the United States.  For the purpose of

supporting our motion on the First Cause of Action it is probably not necessary to amend the

complaint.

40.    Our "Plaintiffs' Proposed Order" (ECF 27, Attachment 4) ought to have more rightly

been titled, or include in the title, and more rightly say in the body of text – mandamus, mandate,

or compel - rather than injunction where the context applies.

41.    Therefore, we exhort the Court to rule in accordance with our Cross-Motion for

Declaratory Judgment as Partial Summary Judgment on the First Cause of Action of our

complaint.  Mandamus relief expressed in our proposed order (ECF 27 Att 4) is warranted.

I, David Alan Carmichael, declare that I have conferred with the two other plaintiffs on this

"Plaintiffs' Combined Reply to Defendants' Opposition To Plaintiffs' Motion For Partial

Summary Judgment."  I agree with them that this is our reply to the Defendants' response to our

cross-motion on the First Cause of Action.  The foregoing statements known by me first-hand are

true.  The other facts, deducible by the facts and circumstances, are believed by me to be true

unless refuted by proof.  I so swear under the penalty of perjury under the laws of the United

States of America.

Signed _David Alan Carmichael_   Date: _april 1, 2020_
        David Alan Carmichael
        1748 Old Buckroe Road
        Hampton, Virginia   23664
        (757) 850-2672
        david@freedomministries.life

I, William Mitchell Pakosz, declare that I have conferred with the two other plaintiffs on this

"Plaintiffs' Combined Reply to Defendants' Opposition To Plaintiffs' Motion For Partial

Summary Judgment."  I agree with them that this is our reply to the Defendants' response to our

cross-motion on the First Cause of Action.  The foregoing statements known by me first-hand are

true.  The other facts, deducible by the facts and circumstances, are believed by me to be true

unless refuted by proof.  I so swear under the penalty of perjury under the laws of the United

States of America.

Signed _____          Date: _____
            William Mitchell Pakosz
            P.O. Box 25
            Matteson, Illinois  60443

I, Lawrence Donald Lewis, declare that I have conferred with the two other plaintiffs on this

"Plaintiffs' Combined Reply to Defendants' Opposition To Plaintiffs' Motion For Partial

Summary Judgment."   I agree with them that this is our reply to the Defendants' response to our

cross-motion on the First Cause of Action.   The foregoing statements known by me first-hand are

true.   The other facts, deducible by the facts and circumstances, are believed by me to be true

unless refuted by proof.   I so swear under the penalty of perjury under the laws of the United

States of America. .

Signed _____   Date: _1 APRIL 2020_
Lawrence Donald Lewis
966 Bourbon Lane
Nordman, Idaho  83848

# UNITED STATES DISTRICT COURT

for the

District of Columbia

David Alan Carmichael )
    *et al.* )
     )
  *Plaintiffs* )
     )
    v. )     Civil Action No.  1:19-CV-2316-RC
     )
Michael Richard Pompeo )
    *In his Official Capacity as Secretary of State* )
    *et al.* )
     )
  *Defendants* )

**Coversheet**

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 1**

**Declaration of Fact, David Alan Carmichael**

# UNITED STATES DISTRICT COURT

for the
District of Columbia

David Alan Carmichael )
*et al.* )
)
*Plaintiffs* )
)
v. )    Civil Action No.  1:19-CV-2316-RC
)
Michael Richard Pompeo )
*In his Official Capacity as Secretary of State* )
*et al.* )
)
*Defendants* )

## Addendum 1

### Plaintiff Carmichael's Declaration of Fact and Motion To Add To The Record As Evidence, Carmichael's Original Complaint And Subsequent Documents

1.  The Carmichael v. Pompeo original Complaint which the Clerk filed on July 31, 2019 (ECF 1), was signed as sworn under oath, verified by a notary public commissioned in Virginia, with the Notary's jurat seal affixed.

2.  The Complaint – Amended, filed by the Clerk on December 3, 2019 (ECF 15), was signed by me (p. 44 of 46) with a presumption of penalty of perjury, saying "I, David Alan Carmichael, swear that the foregoing statements known by me first-hand are true. The other facts, deducible by the facts and circumstances, are believed by me to be true unless refuted by proof." I only recently discovered the clerical error of the deletion or exclusion of the statement "under penalty of perjury." I hereby do declare it was a clerical error and I intended to add the statement that it was sworn under the penalty of perjury under the laws of the United States. In lieu of that, I hereby declare that with regard to the Complaint – Amended, I, David Alan Carmichael swear under the penalty of perjury under the laws of the United States of America that the foregoing statements known by me first-hand are true. The other facts, deducible by the facts and circumstances, are believed by me to be true unless refuted by proof.

3.   The original complaint (ECF 1), and the Complaint Amended (ECF 15), and the facts therein, have not been particularly refuted by the Defendants though they have had ample time.  Facts from those documents (ECF 1 & 15) were cited in the "Plaintiffs' Combined Memorandum In Support of: Response to Defendants' Motions to Dismiss Rule 12(b)(1) and (6), or In The Alternative For Summary Judgment under Rule 56; and Plaintiffs Cross-Motion for Declaratory Partial Summary Judgment and Injunction On The First Cause of Action" (ECF 27, Att. 1)  Facts from those documents (ECF 1 & 15) were cited in the "Plaintiff's Statement of Undisputed and Uncontroverted Facts (ECF 27, Att. 3).  The Defendant had ample time to refute them particularly but has not done so.

4.   I hereby move, that the original complaint document, ECF 1, and the Complaint – Amended, ECF 15, be ordered as **evidence** for the record.


I, David Alan Carmichael, swear under the penalty of perjury under the laws of the United States of America, that the foregoing statements known by me first-hand are true.  The other facts, deducible by the facts and circumstances, are believed by me to be true unless refuted by proof.

(Signature): _David Alan Carmichael_        (Date) _april 1, 2020_
David Alan Carmichael
1748 Old Buckroe Road
Hampton, Virginia  23664

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| David Alan Carmichael<br>*et al.* | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:19-CV-2316-RC |
| | ) | |
| Michael Richard Pompeo | ) | |
| *In his Official Capacity as Secretary of State*<br>*et al.* | ) | |
| | ) | |
| *Defendants* | ) | |

**Coversheet**

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 2**

**Declaration of Fact, Lawrence Donald Lewis**

# UNITED STATES DISTRICT COURT

for the
District of Columbia

| | |
|---|---|
| David Alan Carmichael<br>*et al.*<br><br>*Plaintiffs*<br><br>v.<br><br>Michael Richard Pompeo<br>*In his Official Capacity as Secretary of State*<br>*et al.*<br><br>*Defendants* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.  1:19-CV-2316-RC |

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 2**

**Plaintiff Lewis's Declaration of Fact and Motion To Add To The Record As Evidence,
Lewis's Petition For Joinder And Subsequent Documents**

1.  The "PETITION FOR JOINDER by Lawrence Donald Lewis" was filed by the Clerk filed on

September 26, 2019 (ECF 5), was signed as sworn under oath, verified by a notary public commissioned

in the State of Idaho, with the Notary's jurat seal affixed. There I did swear that "… the foregoing facts

in the statement of facts, known by me first-hand, are true. The other facts, deducible by the facts and

circumstances, are believed by me to be true unless refuted by proof."

2.  The Complaint – Amended, filed by the Clerk on December 3, 2019 (ECF 15), was signed by me

(p. 46 of 46) sworn under the penalty perjury where I declared, "I, Lawrence Donald Lewis, do swear

that the foregoing facts in the statement of facts, known by me first-hand, are true. The other facts,

deducible by the facts and circumstances, are believed by me to be true unless refuted by proof. Under

the penalty of perjury under the laws of the United States."

3.  My Petition for Joinder sworn declaration (ECF 5), and my sworn declaration in the Complaint -

Amended (ECF 15), and the facts therein, have not been particularly refuted by the Defendants though

they have had ample time.  Facts from those documents (ECF 5 & 15) were cited in the "Plaintiffs'

Combined Memorandum In Support of:  Response to Defendants' Motions to Dismiss Rule 12(b)(1) and

(6), or In The Alternative For Summary Judgment under Rule 56; and Plaintiffs Cross-Motion for

Declaratory Partial Summary Judgment and Injunction On The First Cause of Action" (ECF 27, Att. 1)

Facts from those documents (ECF 5 & 15) were cited in the "Plaintiff's Statement of Undisputed and

Uncontroverted Facts (ECF 27, Att. 3).  The Defendant had ample time to refute them particularly but

has not done so.

4.  I hereby move, that my Petition for Joinder (ECF 5), and my sworn declaration in the Complaint

- Amended (ECF 15), be ordered as **evidence** for the record.


I, Lawrence Donald Lewis, swear under the penalty of perjury under the laws of the United States of

America, that the foregoing statements known by me first-hand are true.  The other facts, deducible by

the facts and circumstances, are believed by me to be true unless refuted by proof.

(Signature): _Lawrence Donald Lewis_   (Date) 1 APR 2020

Lawrence Donald Lewis
966 Bourbon Road
Nordman, Idaho  83848

# UNITED STATES DISTRICT COURT

for the
District of Columbia

David Alan Carmichael            )
       *et al.*                    )
                             )
    *Plaintiffs*               )
                             )
       v.                     )      Civil Action No.  1:19-CV-2316-RC
                             )
Michael Richard Pompeo       )
    *In his Official Capacity as Secretary of State*   )
          *et al.*                   )
                             )
    *Defendants*             )

**Coversheet**

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 3**

**Declaration of Fact, William Mitchell Pakosz**

# UNITED STATES DISTRICT COURT

for the
District of Columbia

| | | |
|---|---|---|
| David Alan Carmichael<br>*et al.* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:19-CV-2316-RC |
| | ) | |
| Michael Richard Pompeo | ) | |
| *In his Official Capacity as Secretary of State*<br>*et al.* | ) | |
| | ) | |
| *Defendants* | ) | |

### Plaintiffs' Combined Reply to Defendants' Opposition
### To Plaintiffs' Motion For Partial Summary Judgment

### Addendum 3

### Plaintiff Pakosz's Declaration of Fact and Motion To Add To The Record As Evidence,
### Pakosz's Petition For Joinder And Subsequent Documents

1.  The "PETITION FOR JOINDER by William Mitchell Pakosz" was filed by the Clerk filed on

September 27, 2019 (ECF 6, Att. 2); and was signed as sworn under oath, verified by a notary public

commissioned in the State of Illinois, with the Notary's jurat seal affixed.  There I did swear that "… the

foregoing statement of facts is true."

2.  The Complaint – Amended, filed by the Clerk on December 3, 2019 (ECF 15), was signed by me

(p. 45 of 46) sworn under the penalty perjury where I declared, "I, William Mitchell Pakosz, do swear

that the foregoing facts in the statement of facts, known by me first-hand, are true.  The other facts,

deducible by the facts and circumstances, are believed by me to be true unless refuted by proof.  Under

the penalty of perjury under the laws of the United States."

3.  My Petition for Joinder sworn declaration (ECF 6, Att. 2), and my sworn declaration in the

Complaint - Amended (ECF 15), and the facts therein, have not been particularly refuted by the

Defendants though they have had ample time.  Facts from those documents (ECF 6 & 15) were cited in

the "Plaintiffs' Combined Memorandum In Support of:  Response to Defendants' Motions to Dismiss

Rule 12(b)(1) and (6), or In The Alternative For Summary Judgment under Rule 56; and Plaintiffs

Cross-Motion for Declaratory Partial Summary Judgment and Injunction On The First Cause of Action"

(ECF 27, Att. 1)  Facts from those documents (ECF 6 & 15) were cited in the "Plaintiff's Statement of

Undisputed and Uncontroverted Facts (ECF 27, Att. 3).  The Defendant had ample time to refute them

particularly but has not done so.

4.  I hereby move, that my Petition for Joinder (ECF 6, Att. 2), and my sworn declaration in the

Complaint - Amended (ECF 15), be ordered as **evidence** for the record.


I, William Mitchell Pakosz, swear under the penalty of perjury under the laws of the United States of

America, that the foregoing statements known by me first-hand are true.  The other facts, deducible by

the facts and circumstances, are believed by me to be true unless refuted by proof.


(Signature): _____        (Date) _____

William Mitchell Pakosz
Box 25
Matteson, Illinois  60443

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| David Alan Carmichael | ) | |
| *et al.* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:19-CV-2316-RC |
| | ) | |
| Michael Richard Pompeo | ) | |
| *In his Official Capacity as Secretary of State* | ) | |
| *et al.* | ) | |
| | ) | |
| *Defendants* | ) | |

**Coversheet**

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 4**

***Callahan v. Woods*, 736 F.2d 1269, (9th Cir., 1984)**

No. 83-1688

United States Court of Appeals, Ninth Circuit

# Callahan v. Woods

736 F.2d 1269 (9th Cir. 1984)
Decided Mar 30, 1984

No. 83-1688.

Argued and Submitted January 13, 1984.

1270 Decided March 30, 1984. As Amended July 5, 1984. *1270

1271 Alan Jaroslovsky, Santa Rosa, Cal., for plaintiff/appellant. *1271

Winifred Smith, Deputy Atty. Gen., San Francisco, Cal., Peter R. Maier, Dept. of Justice, Washington, D.C., for defendants/appellees.

Appeal from the United States District Court for the Northern District of California.

Before GOODWIN, PREGERSON and NELSON, Circuit Judges.

---

NELSON, Circuit Judge:

Out of a sincere religious belief that universal numbers are "the mark of the beast" by which the Antichrist endeavors to control mankind, Robert Dale Callahan seeks to receive Aid to Families with Dependent Children benefits without having to obtain a social security number for his infant daughter. The district court granted summary judgment against Callahan, ruling that the burden on Callahan's religious exercise was outweighed by the government's compelling interest in having aid recipients classified by number, and that the number requirement was the least restrictive means of administering the AFDC program. On appeal, Callahan asks this court to reverse the summary judgment and instruct the district court to enter judgment in his favor on the ground that "administrative viability" cannot constitute the compelling state interest required to override a protected religious belief. Because neither party is entitled to summary judgment on the facts presented, we remand to the district court for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

State participation in the Aid to Families with Dependent Children program ("AFDC"), 42 U.S.C. § 601 et seq., is optional. To participate, a state must submit to the Secretary of Health and Human Services ("HHS") a plan that meets all the requirements of the federal statute, 42 U.S.C. § 602(a), and the implementing federal regulations, 42 U.S.C. § 602(b); 45 C.F.R. § 201.2.

Section 602(a)(25), added in 1974, provides:

(A) that, as a condition of eligibility under the plan, *each applicant for or recipient of aid shall furnish* to the State agency *his social security account number* (or numbers, if he has more than one such number), and (B) that such State agency shall utilize such account numbers, in addition to any other means of identification it may determine to employ in the administration of such plan. . . .



(Emphasis added.) "Applicant" and "recipient" are defined in the implementing regulation as including "the caretaker relative, the children, and any other individual whose needs are considered in determining the amount of assistance." 45 C.F.R. § 232.10(f). Accordingly, the State of California has adopted regulations which comply with the federal social security number ("SSN") requirement. *See* E.A.S. (eligibility and assistance standards) § 40-105.2.

In 1979 Robert Dale Callahan sought to enjoin the Director of the California Department of Social Services and the Secretary of HHS from requiring him to obtain a social security number for his infant daughter, Serena, in order to receive AFDC benefits to which his family was otherwise entitled. Callahan claimed that compliance with the regulation requiring an SSN would impermissibly burden his first amendment right to free exercise of his religious beliefs. Specifically, he claimed that the *Book of Revelation* condemns the use of a universal number to designate a human being because such a number is the "mark of the beast" through which the Antichrist seeks to control mankind.[1] Callahan *1272* therefore refused to force his daughter to assume that mark.

1272

[1]   Chapter 13 of the New Testament *Book of Revelation* reads in part:

> 16. He [the beast] causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads:

> 17. And that no man might buy or sell, save he that had the mark, or the name of the beast, or the number of his name;

> 18. Here is wisdom. Let him that hath understanding count the number of the beast: for it is the number of a man; and his number is six hundred threescore and six.

Earlier in this lawsuit, the district court held that while Callahan's beliefs were sincere, they were not entitled to first amendment protection because they arose in a purely secular context and were not therefore "rooted in religious belief." *Callahan v. Woods,* 479 F. Supp. 621, 622 (N.D.Cal. 1979). This court reversed the award of summary judgment, holding that Callahan's beliefs were religious and therefore protected by the first amendment. It remanded the case to the district court to consider: 1) the extent to which Callahan's beliefs are burdened by the government's SSN requirement; and 2) whether the government regulation is the least restrictive means of achieving some compelling state interest. *Callahan v. Woods,* 658 F.2d 679, 687 (9th Cir. 1981).

On remand, the district court, 559 F. Supp. 163, determined that the burden on Callahan, although substantial, was heavily outweighed by the government's compelling interest in having aid recipients classified by SSNs, and that the requirement is the least restrictive means of administering efficiently an enormous social welfare program. The court based its grant of summary judgment for the government on the detailed affidavits of two HHS officials which describe the origins, use, and operation of the SSN system in the AFDC program. Callahan appeals.

## ISSUE

Was the district court correct in ruling as a matter of law that a regulation requiring the assignment of a number to *every* social security recipient is the least restrictive means of furthering a compelling state interest?

## STANDARD OF REVIEW

 casetext

Grants of summary judgment are reviewable by this court *de novo. National Union Fire Insurance Co. v. Argonaut Insurance Co.,* 701 F.2d 95, 96 (9th Cir. 1983). Summary judgment has been properly granted when it appears that there was no genuine issue as to any material fact and that the moving party was entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c). In this case, Callahan did not argue below and does not argue here that disputed issues of fact precluded summary judgment. Rather, he contends that the government cannot prevail as a matter of law. We must therefore accept the uncontested government affidavits as the facts of this case to which the law must be applied.

## DISCUSSION [14] I. Formulating the Applicable Test

The government must shoulder a heavy burden to defend a regulation affecting religious actions. It is usually said that the challenged regulation must be the least restrictive means of furthering a compelling state interest. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

Commentators have observed that, because of its broad and indefinite nature, this test is often inadvertently reduced to an inquiry which stops after the discovery of a compelling state interest. *See, e.g.,* Tribe, *American Constitutional Law* 855 (1978). The purpose of almost any law, however, can be traced to a fundamental concern of government. Balancing an individual's religious interest against such a concern will inevitably make the former look unimportant. It is therefore the "least restrictive means" inquiry which is the critical aspect of the free exercise analysis. This prong forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction. *See* Clark, *Guidelines for the Free Exercise Clause,* 83 Harv.L.Rev. 327, 331 (1969). If the compelling state goal can be accomplished despite the exemption of a particular individual, then a regulation 1273 which denies an exemption is not the least *1273 restrictive means of furthering the state interest. A synthesis of the two prongs is therefore the question whether the government has a compelling interest in not exempting a religious individual from a particular regulation. *See, e.g., Sherwood v. Brown,* 619 F.2d 47, 48 (9th Cir. 1980) (compelling state interest in not exempting Sikh from Navy helmet requirement because absence of single helmet would endanger entire crew). Such a formulation prevents the government from relying on its generally great interest in maintaining the underlying rule or program for unexceptional cases.

This court has adopted a method of analyzing free exercise claims which accurately reflects the relevant concerns. In determining whether a neutrally based statute violates the free exercise clause, we consider three factors:

> (1) the magnitude of the statute's impact upon the exercise of the religious belief;
>
> (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief; and
>
> (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*E.E.O.C. v. Pacific Press Pub. Assoc.,* 676 F.2d 1272, 1279 (9th Cir. 1982), *citing Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

## II. Applying the Test [20] A. Magnitude of Impact

Appellees, although content with the result below, argue that the district court was not required to find a "compelling state interest" because the burden in this case, although substantial, was indirect rather than direct. They argue that the constitutionality of regulations imposing only an indirect burden upon the exercise of religious beliefs must be assessed by merely balancing the burden against the government's interest supporting the regulation.

This contention is without merit. *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), states that "[w]hile the compulsion [upon an individual to modify his religious beliefs to receive benefits] may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.* at 718, 101 S.Ct. at 1432. A substantial burden is justified only by a showing that the requirement is the least restrictive means of achieving some compelling government interest. *Id.*

In *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982), the Court similarly asked only whether the challenged requirement "interfered" with the litigant's free exercise, not whether the interference was direct or indirect. While it is true that the Supreme Court has phrased the test in somewhat different ways, *see, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (overriding state interest); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (compelling state interest), the Court generally comes close to applying strict scrutiny when a regulation imposes a substantial, albeit incidental, burden on religious belief. *See* Choper, Kamisar, Tribe, *The Supreme Court: Trends and Developments 1981-1982* at 56 (1983). The only two courts which have considered the precise issue in this case applied the compelling state interest standard. *See Mullaney v. Woods,* 97 Cal.App.3d 710, 158 Cal.Rptr. 902 (1979); *Stevens v. Berger,* 428 F. Supp. 896 (E.D.N.Y. 1977). We conclude that the SSN requirement substantially interferes with the free exercise of Callahan's religious beliefs. Accordingly, the compelling state 1274 interest test applies.  *1274

## B. Compelling State Interest

In determining whether the government[2] has a compelling interest in a particular regulation, it is useful to look first at the importance of the value underlying the regulation, and second, at the degree of proximity and necessity that the chosen regulation bears to the underlying value. *See* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development,* 80 Harv.L.Rev. 1381, 1390 (1967).

[2]  Because the federal government, through section 602(a)(25) of the Social Security Act, forces the State of California to require recipients to have SSNs before receiving aid, it is the federal government's interest in the SSN requirement which we will consider.

The value of the AFDC program, a nationwide social welfare system, is undeniably important. *Cf. United States v. Lee,* 455 U.S. 252, 258, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) (social security system). The AFDC program exists to encourage the care of needy dependent children in their own homes by enabling each state to provide financial assistance to the parents and relatives with whom these children live. 42 U.S.C. § 601. Such assistance is intended to strengthen family life and help families attain the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection. *Id.* We have no trouble concluding that the AFDC program, which reaches millions of American families each month, promotes a government interest of the highest importance.

Additionally, the proximity and necessity of the challenged regulation to the underlying value is clear. The regulation requiring SSNs for AFDC recipients appears to be essential for the system's efficient operation, because the use of SSNs as unique identifiers is by far the most cost-effective means of administering the

program.[3] According to the government affidavits, which were not contested by Callahan, the development and maintenance of an alternative non-numerical system would cost nearly one billion dollars. These facts suggest that conversion to a non-SSN system for unexceptional cases would introduce massive inefficiencies into the AFDC scheme. We conclude, therefore, that the SSN regulation promotes a compelling state interest.

[3]   The affidavits suggest that the use of a computerized data system based on unique identifiers serves a variety of functions essential to the AFDC's operation. These functions include eligibility verification, proper check payment, avoidance of benefit duplication or over-payment, coordination of AFDC with other federal programs (Medicaid, WIN, Child Support Program) and the ability to exchange information with the states' data processing systems.

## C. Cost of Exempting Callahan

We now turn to the most critical aspect of our free exercise inquiry: the extent to which exempting Callahan from the SSN requirement would impede the goal of administrative efficiency.

The affidavits submitted below fail to address the potential cost, financial or otherwise, of exempting one person from the SSN requirement. They state only that "conversion to . . . a non-numerical system would cost in excess of 900 million dollars." There was no evidence below, however, that the exemption of one person from the number requirement would mandate the development of an entire non-numerical system.[4] There was 1275 also no evidence that any more than one person holds Callahan's religious beliefs.[5] Absent such evidence, *1275 the district court was completely unable to address the third, and most critical, prong of the free exercise inquiry.

[4]   In New York in 1977 an individual holding the same religious belief as Callahan was permitted to receive AFDC benefits without obtaining SSNs for his four children. *See Stevens v. Berger.* None of the parties here addressed the costs incurred by the government after that case was decided.

[5]   In *Thomas,* the Supreme Court gave no weight to the government's mere speculation that other individuals with religious beliefs similar to Thomas' would quit their jobs and seek unemployment benefits:

There is no evidence in the record to indicate that the number of people who find themselves in the predicament of choosing between benefits and religious beliefs is large enough to create `widespread unemployment' or even to seriously affect unemployment. . . .

450 U.S. at 719, 101 S.Ct. at 1432. Similarly, we grant no weight to the government's implication that many people may hold Callahan's religious belief.

Because it did not have the relevant facts before it, the district court could not properly have found that exempting Callahan from the SSN requirement would be incompatible with the government's efficient operation of the AFDC program. Such a finding is a prerequisite to the conclusion that the SSN regulation is the least restrictive means of furthering a compelling state interest. We must therefore reverse the grant of summary judgment for the government.

Callahan urges us to grant summary judgment in his favor because the government, which had the burden of proving that an exemption would impede administrative efficiency, failed to establish the cost of exempting Callahan. While we have the power to grant summary judgment to an appellant, *see* Wright Miller, 10 *Federal Practice and Procedure* § 2716 at 660-61 (1983), we hesitate to do so if it would unfairly deprive the other party of the opportunity to present pertinent evidence. It is possible that the law, before this appeal, was not sufficiently clear to have afforded the government a realistic opportunity to present the relevant facts. We

Callahan v. Woods    736 F.2d 1269 (9th Cir. 1984)

therefore choose to remand this case for the district court to consider whether the government had a reasonable opportunity to establish the cost of exempting Callahan. If it finds that the government passed up this opportunity, we direct the court to enter judgment for Callahan.

REVERSED and REMANDED.

 casetext

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

David Alan Carmichael            )
        *et al.*               )
                        )
    *Plaintiffs*          )
                        )
      v.              )     Civil Action No.  1:19-CV-2316-RC
                        )
Michael Richard Pompeo     )
   *In his Official Capacity as Secretary of State*  )
      *et al.*                )
                        )
    *Defendants*        )

**Coversheet**

**Plaintiffs' Combined Reply to Defendants' Opposition
To Plaintiffs' Motion For Partial Summary Judgment**

**Addendum 5**

***Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir., 1981)**

No.    - 61

United States Court of Appeals, Ninth Circuit

# Callahan v. Woods

658 F.2d 679 (9th Cir. 1981)

Decided Oct 5, 1981

No. 79-4612.

Argued and Submitted June 10, 1981.

681  Decided October 5, 1981. Rehearing Denied January 19, 1982. *680 *681

Alan Jaroslovsky, Santa Rosa, Cal., for plaintiff-appellant.

Leonard Schaitman, Dept. of Justice, Washington, D.C., for defendants-appellees.

Appeal from the United States District Court for the Northern District of California.

Before ADAMS,  GOODWIN and FARRIS, Circuit Judges.

Hon. Arlin M. Adams, United States Court of Appeals for the Third Circuit, sitting by designation.

ADAMS, Circuit Judge.

On this appeal we are asked to determine whether the state and federal governments, in requiring Robert D. Callahan to obtain a social security number for his daughter before she could obtain public assistance benefits, even though procuring such a number would contravene what appellant asserts is a sincere religious belief, violated his First Amendment right to the free exercise of religion. Because the district court, 479 F. Supp. 621, in awarding summary judgment for the government, incorrectly construed plaintiff's beliefs as non-religious, we reverse its judgment and remand for a determination of the governments' interest in the regulation.

## I.

Callahan is married and has two children. Following his release from prison in 1974 he was unemployed, and his family became eligible to receive Aid to Families with Dependent Children (AFDC) benefits for both children. The State of California paid those benefits in full until May 10, 1977, when the County of Sonoma notified Callahan that his younger child, Serena, for whom Callahan refused to obtain a social security number, was no longer eligible. Callahan, his wife, and their older child all held social security numbers at the time. The State, in requiring a social security number for AFDC eligibility acted pursuant to the mandate of Section

682  402(a)(25) of the Social Security Act, 42 U.S.C. § 602(a)(25) (1976).[1] *682

[1] Although we do not reach the issue whether the Social Security Act requires numbers for children on whose behalf parents receive AFDC benefits, we note that courts confronting the issue have construed the statute to mandate issuance of the numbers. *See McElrath v. Califano,* 615 F.2d 434 (7th Cir. 1980); *Green v. Philbrook,* 576 F.2d 440 (2d Cir. 1978); *Doe v. Sharp,* 491 F. Supp. 346 (D.Mass. 1980); *Mullaney v. Woods,* 97 Cal.App.3d 710, 718, 158 Cal.Rptr. 902 (1979).



Although born a Catholic and raised as a Baptist, Callahan did not develop a strong interest in religion until 1973, while at San    uentin. Since then he has read the Bible for half an hour to an hour each day, and is now a member of the West Santa Rosa Baptist Church. Callahan, who claims to have a literal belief in the Bible, asserts that his refusal to comply with the social security number requirement for Serena is solely religious. He cites in support of his objection to social security numbers a religious text, Chapter 13 of the New Testament *Book of Revelation,* which reads in part:

> 16. [H]e causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads;

> 17. And that no man might buy or sell, save that he had the mark, or the name of the beast, or the number of his name;

> 18. Here is wisdom. Let him that hath understanding count the number of the beast: for it is the number of a man; and his number *is* Six hundred three-score *and* six.

According to Callahan, social security numbers are the "mark of the beast"    the sign of the Antichrist who threatens to control the world. To accept a number, he maintains, is to "serve the beast." Callahan acknowledges that his aversion to social security and other personal identification numbers predates his interest in religion. Nonetheless, he asserts that his objection was religious in nature, that the *Revelation* text articulates a concept that he felt in a more inchoate form before studying the Bible. He and his wife freely accepted social security numbers, but according to appellant they did so before he arrived at his religious understanding. Although Callahan did not wish to obtain a number for his first child he did so, apparently fearing violation of his parole, which terminated in December 1975. Now he believes that, on behalf of Serena,[2] he must observe his religious objections to assigning numbers and preserve her freedom to avoid serving the beast, even though she may well decide later to obtain a number voluntarily.

---

[2] Parents may exercise constitutional rights on behalf of their children. *See Wisconsin v. Yoder,* 406 U.S. 205, 232-34, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510, 534-35, 45 S.Ct. 571, 573-74, 69 L.Ed. 1070 (1925).

---

Upon receiving notification that benefits for Serena would be terminated, Callahan, pursuant to California administrative procedure, sought a hearing before the Department of Benefit Payments. The hearing officer found that Callahan held sincere religious beliefs that militated against issuance of a social security number for his daughter; nonetheless he held that federal regulations required the issuance of such a number before any more benefits could be paid on behalf of Serena. Callahan petitioned the Sonoma Superior Court for a writ of mandamus to compel the payment of those benefits. The Secretary of Health, Education, and Welfare (now Health and Human Services) was joined in that action as the real party in interest, and the case was removed to federal court. In the district court, Callahan and the Secretary filed cross-motions for summary judgment. The judge held an evidentiary hearing, consisting of live testimony by the plaintiff. On the basis of that hearing as well as the pleadings and affidavits previously filed, the court found that Callahan's views on the undesirability of personal identification numbers were, though sincere, not religious in nature. Rather, he found that they were primarily manifestations of a personal, secular philosophy developed during Callahan's thirteen years of incarceration. The court concluded that although Callahan relied upon "concepts admittedly drawn from traditional religious text," he did so only "to justify and support a secular, philosophical objection to the use of social security numbers by the government." *Callahan v. Woods,* 479 F. Supp. 621, 625 (N.D.Cal. 1979).



Consequently the court granted the government's summary judgment motion, holding that the state, in requiring Callahan to acquire a number for Serena before she could receive AFDC benefits, did not burden a protected interest. *683

## II.

A religious claim, to merit protection under the free exercise clause of the First Amendment,[3] must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held; the First Amendment does not extend to "so-called religions which . . . are obviously shams and absurdities and whose members are patently devoid of religious sincerity." *Theriault v. Carlson,* 495 F.2d 390, 395 (5th Cir. 1974), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *see Stevens v. Berger,* 428 F. Supp. 896, 899 (E.D.N.Y. 1977). Second, as the Supreme Court held in *Wisconsin v. Yoder,* 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972), the claim must be rooted in religious belief, not in "purely secular" philosophical concerns. *Cf. United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (test for religious belief within meaning of draft law exemptions is whether beliefs professed are sincerely held and, in claimant's scheme of things, religious).[4]

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[4] Though it construed a statute rather than the Constitution itself, *Seeger* is often read as addressing constitutional limits inherent in the draft statute; the case is therefore applicable to First Amendment analysis generally. *See Malnak v. Yogi,* 592 F.2d 197, 203-05 (3d Cir. 1979) (Adams, J., concurring); Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L. Rev. 1056, 1064 n. 56.

Initially we are faced with some ambiguity in the district court's application of the two-part test. It found that the plaintiff was sincere in his objection to identification numbers, but that his objection was not "rooted in religious belief." 479 F. Supp. at 624. The court did not explicitly attach its finding of sincerity to a specific idea or claim of Callahan's. Arguably, the court might have meant merely that Callahan sincerely dislikes social security numbers, but sincerity of that sort would be obvious from the very existence of this lawsuit. A First Amendment inquiry into sincerity generally has a different focus, addressing the sincerity with which the claimant holds the allegedly religious belief itself. *See, e. g., Theriault v. Carlson, supra,* 495 F.2d at 394-95. Thus, construed properly the trial court's blanket finding of sincerity must mean that the plaintiff, when he says that he opposes personal identification numbers because they are the "mark of the beast" and tools of the Antichrist, sincerely believes in the diabolical nature of those numbers. The remaining question, then, is whether Callahan's objections are "rooted in" a belief that is religious in nature. *See Wisconsin v. Yoder,* 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1977).

In purportedly examining whether Callahan's views were "rooted in" his alleged scriptural interpretation, the court focused on issues that in this case were more relevant to the already settled question of sincerity. It is of course imaginable that in some circumstances a person might assert a First Amendment claim and attempt to justify it with a religious belief which, though sincerely held, was simply irrelevant to the claim. For example, *Yoder* involved claims by the Amish that public education for their children after the eighth grade violated their religious beliefs. If in that case the court had determined that the objection of the Amish to education was unrelated to their religious beliefs, then their constitutional claim would have had no merit even though their religious beliefs were sincere. *See Yoder,* 406 U.S. at 215-16, 92 S.Ct. at 1532-33. But just as the Supreme Court found in that case that the claim *was* related to the religious belief of the Amish, 406 U.S. at 215-16, 92 S.Ct. at 1532-33, here the relevance of Callahan's proffered beliefs to his claim is apparent. Indeed, it is hard to imagine how Callahan's belief that social security numbers are the "mark of the beast" could, if sincere, be

considered irrelevant to his stand against the issuance of a number for Serena. Once his belief is established as sincere, it would seem indisputable that Callahan's objection must be "rooted in" that belief, at least in part.

684 *684

Nonetheless, the court concluded that Callahan's objection to identification numbers, although sincere, was actually "rooted in" secular and philosophical concerns. In reaching this result, the court emphasized that Callahan's aversion to identification numbers predated by many years his religious awakening, and found that Callahan's long prison experience was the major impetus to his belief. 479 F. Supp. at 624-25. Distinguishing *Stevens v. Berger, supra,* a case which similarly involved plaintiffs who objected to the issuance of social security numbers for their children on the ground that such numbers were the "mark of the beast," the trial court here noted that in this case:

> Plaintiff's beliefs arose in a purely secular context, uninformed by religious training or inspiration. Under such circumstances, the First Amendment does not shield plaintiff from the legitimate commands of the government.

479 F. Supp. at 625 n.6. This reasoning strongly suggests an underlying premise that a long-held secular belief invalidates First Amendment protection for a related but newly-alleged religious belief.

This premise may in some cases be applicable to the question of sincerity. A person seeking to advance a secular interest might, if frustrated in his pursuit, decide to mask the cause in religious garb in order to bring it under First Amendment protection. The existence of a longstanding philosophical belief which has only recently, and to the claimant's advantage, taken on theological overtones could certainly give rise to reasonable suspicion of dissimulation. If the district court had, after hearing Callahan's testimony, decided that his current objection to social security numbers had nothing to do with the reason proffered, and thus decided that his claims about the "mark of the beast" were fictitious trappings for his longstanding secular concerns,[5] then the court would be obliged to find him insincere and his claims entitled to no special privilege. But where, as here, the court has found that the allegedly religious belief is sincerely held, the presence of longstanding secular objections does not refute the finding of sincerity any more than it negates in this case the obvious connection between Callahan's allegedly religious belief and his objection to obtaining a number.

[5] Others have opposed the issuance of social security numbers on wholly secular grounds. *See McElrath v. Califano,* 615 F.2d 434 (7th Cir. 1980) (requiring social security numbers for dependent children as a condition of AFDC benefits does not violate constitutional rights of privacy and equal protection); *Doe v. Sharp,* 491 F. Supp. 346 (D.Mass. 1980) (Social security number requirement for AFDC eligibility held not to violate constitutional right to privacy or statutory language of AFDC statute.); *Green v. Philbrook,* 576 F.2d 440 (2d Cir. 1978).

Because Callahan's distaste for numbers is longstanding, one might infer that even if he now objects to numbers on scriptural grounds, he opposes them for personal and philosophical reasons as well. But a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one. In *Yoder* the Supreme Court warned that a belief that is based on "purely secular considerations" merits no protection under the free exercise clause. 406 U.S. at 215, 92 S.Ct. at 1532. It did not limit the scope of the First Amendment to "purely religious" claims; the area of overlap is presumably protected. The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products. Religious duties need not contradict personal values or preferences in order to be protected. It might be argued that Callahan's personal animus toward numbers would by itself have been enough to motivate his refusal to give Serena a

685 number.[6] Even if *685 this were the case, his sincere objection to burdening her with the "mark of the beast" would provide a separate and sufficient reason for his action, one that, if characterized as religious, merits constitutional protection.[7]

> 6  It seems unlikely, however, that Callahan's long-standing secular reasons for objecting to social security numbers would
> by themselves have prompted the refusal to issue Serena a number; while he held such views he and his wife freely
> accepted numbers themselves.

> 7  St. Augustine and the British writer, G. K. Chesterton, are examples of persons who first had strong philosophical
> convictions or views that in later life became religious in nature.

## III.

In applying the free exercise clause of the First Amendment, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs. *See United States v. Ballard,* 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); *Stevens v. Berger,* 428 F. Supp. 896, 899 (E.D.N.Y. 1977) ("A. religious belief can appear to every other member of the human race preposterous, yet merit the protections of the Bill of Rights.") The Supreme Court has recognized that if the free exercise right were dependent on one's ability to establish the truth of one's beliefs, then the First Amendment guarantees might be rendered illusory. In *Ballard,* leaders of the "I Am" movement, one of whom claimed status as a specially designated messenger of God, were convicted of mail fraud in their solicitations. The Supreme Court held that the district court had acted properly in withholding from the jury any consideration of the truth of the religious statements made and limiting the jury to a determination whether the defendants sincerely believed in their religious assertions. The Court explained:

> The religious views espoused by respondents might seem incredible, if not preposterous, to most
> people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity,
> then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that
> task, they enter a forbidden domain.

322 U.S. at 87, 64 S.Ct. at 886.

It is nonetheless incumbent on the courts to ensure that a free exercise claim is granted only when the threatened belief is religious in nature. *Wisconsin v. Yoder,* 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972). While defining religious belief is often quite difficult, *see Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *United States v. Seeger,* 380 U.S. 163, 174, 85 S.Ct. 850, 858, 13 L.Ed.2d 733 (1965), there can be little doubt that Callahan's interpretation of social security numbers as tools of the Antichrist is religious in nature.

While many cases have grappled with the difficult problem of identifying nontraditional beliefs that merit protection, *see, e. g., Seeger, supra,* this case presents a matter that in many respects is less difficult to resolve. Although traditional religious beliefs are entitled to no greater protection than many nontraditional dogmas, their status as religious beliefs is often more readily ascertained. Indeed, such doctrines are the standard by which other beliefs are measured for inclusion in the First Amendment guarantee. *See Malnak v. Yogi,* 592 F.2d 197, 207 (3d Cir. 1979) (Adams, J., concurring). And in this case, Callahan's views on social security numbers are closely tied to a theistic belief. Callahan is a member of the Baptist church; his ascription of diabolical status to social security numbers is derived from the New Testament's *Book of Revelation,* a text which his church, and indeed most churches, consider holy.

Callahan's interpretation of the scriptures may differ from the meaning members of his church generally find in that text, but such disagreement cannot itself invalidate his free exercise right. Though the district court did not have available the guidance of the Supreme Court's analysis in *Thomas,* since it was decided after the court's decision, that case establishes that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." 450 U.S. at 715, 101 S.Ct. at 1431. In *Thomas,* the Court held that a Jehovah's Witness's objection to producing armaments was religiously motivated ∗686 even though others of his denomination found that work "'scripturally' acceptable." The Court explained that "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Id.* 450 U.S. 715-16, 101 S.Ct. at 1431. While this abstention from evaluating the merits of a scriptural interpretation may not be maintained when the claim is so bizarre or so unrelated to the religious nature of the text that it is "clearly nonreligious in motivation," *id.,* in this case a court cannot disregard Callahan's reading as non-religious. His understanding of the *Revelation* passage is theological and eschatological; it clearly addresses spiritual, not merely worldly, concerns.

Given the close similarity of the ideas involved in this case and those in *Stevens v. Berger, supra,* Judge Weinstein's thorough and compelling analysis of the Stevenses' dogma is fully apposite here.[8] In *Stevens* the plaintiffs, while seeking AFDC benefits for their children, objected to the issuance of social security numbers as a prerequisite to eligibility. They explained that social security numbers were becoming the universal identification number predicted in the *Book of Revelation* as the tool used by the Antichrist to control individuals. The Stevenses feared that obtaining numbers for their children would jeopardize their children's spiritual well-being and threaten their opportunity to enter heaven. 428 F. Supp. at 901-02. Nothing that neither widespread adherence nor scriptural support is a prerequisite to constitutionally protected status for a purportedly religious claim, the court nevertheless traced the history of the Jewish and Christian concepts of the Antichrist and found that "The meaning of the mark to theologians      whatever they believe the mark to have been      is strikingly similar to the meaning for the Stevenses, who see a potential for abuse of the spiritual side of humanity in a number which could act as a universal identifier." 428 F. Supp. at 905. It concluded that:

> [8]  The district court here noted the cogency of Judge Weinstein's analysis, and distinguished Callahan's case not because his belief was at variance with the belief of the Stevenses, but because *Callahan* came to that belief differently. *Callahan v. Woods,* 479 F. Supp. 621, 625 n. 6 (N.D.Cal. 1979).

> Since having a social security number in this society has become a prerequisite for so many of the society's benefits (both from the public and private sectors), no great leap of imagination is necessary to travel from the exegesis of *Revelation* to the plaintiffs' belief that such numbers could functions, if the state were to become too powerful, like the mark of the Antichrist spoken of in the biblical text. With the history and literature marshalled by plaintiffs to support their contention, their belief must be characterized as religious for purposes of this case.

*Id.* at 905. Though Callahan's interpretation of *Revelation* may not have been as well articulated as the Stevenses' interpretation, it reaches the same conclusions for substantially the same stated reasons. And as the Supreme Court recently held in *Thomas,* a person's free exercise should not be curtailed simply because "his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." 450 U.S. at 715, 101 S.Ct. at 1430.

## IV.



It would appear quite clear then that Callahan's views regarding social security numbers as the "mark of the beast" are theological in nature and plainly religious within the meaning of the First Amendment. As the district court found, Callahan sincerely holds those views. It would seem that both requirements of the threshold test for a free exercise claim are satisfied. The appropriate course, therefore, is to determine the extent to which Callahan's protected beliefs were burdened by the government's regulations, consider whether the government has a compelling interest in making social security numbers a prerequisite for AFDC benefits, and decide *687 if that interest may be satisfied by some less restrictive means.[9] *See Thomas, supra,* 450 U.S. at 715, 101 S.Ct. at 1431.

> [9] Courts conducting this balance on facts similar to those involved here have reached different results. *Compare Stevens v. Berger,* 428 F. Supp. 896 (E.D.N.Y. 1977) (government must devise alternative to social security numbers for those few who, like plaintiffs, object to such numbers as the "mark of the beast"), *and Mullaney v. Woods,* 97 Cal.App.3d 710, 158 Cal.Rptr. 902 (1979) (government's interest in comprehensive numbering system for AFDC benefits is compelling and unachievable by less restrictive means, and thus overcomes "incidental infringement" of plaintiff's religious belief that social security numbers are the "mark of the beast").

Before it reached this step, however, the district court seemingly applied an additional threshold requirement: that a claimant's belief must be of religious *origin* in order to fall within the ambit of the First Amendment. The court found that "although plaintiff may now claim [his] beliefs to be `religious' in origin, they predate any involvement on his part with religion     organized or otherwise," 479 F. Supp. at 625. But the correct standard is not whether Callahan's beliefs have *always* been religious; they need only be religious in the context of his life as he now lives it. *Cf. Seeger, supra,* 380 U.S. at 184, 85 S.Ct. at 863 (test for religious exemption under draft statute is whether objector's beliefs play a role in his life similar to that of more traditional theological beliefs). *See generally* Note, *Toward a Constitutional Definition of Religion,* 91    arv.L.Rev. 1056 (1978).

If judicial inquiry into the truth of one's religious beliefs would violate the free exercise clause, *see United States v. Ballard, supra,* 322 U.S. at 87, 64 S.Ct. at 886, an inquiry into one's reasons for adopting those beliefs is similarly intrusive. So long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible. Nor can the courts easily distinguish between beliefs springing from religious and secular origin.[10] A secular experience can stimulate a spiritual response; lives are not so compartmentalized that one can readily keep the two separate. It may well be that Callahan first developed an aversion to numbers when he felt their dehumanizing effect in prison. If later study or inspiration has provided him with an additional, theological objection to numbering people, then his present belief developed out of secular and religious elements that cannot be disentangled. In any event, constitutional protection cannot be denied simply because earlier experience has left him particularly open to his current religious belief.

> [10] Courts are ill-equipped to discriminate according to the psychological basis for a religious faith. *See* Clark, *Guidelines for the Free Exercise Clause,* 83 Harv.L.Rev. 327, 342-43 (1969).

## V.

Inasmuch as Callahan's objections to acquiring a social security number for his daughter are sincerely held and religious in nature, we reverse the holding of the district court and remand for a determination, in light of *Thomas,* of the extent to which Callahan's protected belief is burdened by the government's requirement, and whether the government here is following the "least restrictive means of achieving some compelling . . . interest," *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432.

688  *688

